May it please the Court, Mark Toberoff for the appellant, the estate of Joe Shuster and the other defendants. I'd like to reserve five minutes of my time for rebuttal, if I may. The District Court's order committed clear error in holding that a 1992 pension agreement between DC Comics and Joe Shuster's siblings eliminated the termination right of the Shuster estate under the Copyright Act. The order contravened the Copyright Act, this Court's binding precedent in the Milne and the Newborn case, and Congress's concerted intent to protect the termination right. Congress, ever since the first Copyright Act, has always been concerned about the imbalance of power between publishers and authors and the exploitation of authors by publishers. And in the 1976 Copyright Act, to remedy this imbalance, they included a powerful right of authors to recover their copyrights by terminating prior copyright transfers after a long period of time. Section 304 applies to pre-'78 copyright grants, any pre-'78 copyright grants by an author or the author's heirs. Section 203 allows for termination of post-'78 copyright grants, but only by an author. To protect the termination right from contractual and judicial erosion, Congress included Section 304C5, which states unequivocally that termination may be exercised notwithstanding any agreement to the contrary. They also included Section 304C6D, which states that termination cannot be pre-assigned or settled, but can only be transferred after exercising it by service of a notice of termination. So in 1992, Superman's co-creator, Joe Shuster, died broke and in debt. And his brother, Frank, and sister, Jean, asked DC for some financial assistance. They already owed Frank a survivor pension of $5,000, and they agreed to increase that to $25,000 for both Frank and Jean. And in exchange, included in the 1992 agreement, a simple quick claim and release of any rights or claims to further payment that Jean or Frank may have. In 1992, however, Jean and Frank had no rights. Joe Shuster's copyrights to Superman had long been assigned in 1938. But didn't the agreement say, now as or hereafter may obtain? I believe it included language to that effect as well, yes. So in 1992, it's important to note that Jean and Frank had no rights to speak of. Joe Shuster had assigned his copyrights long ago in 1938 in a simple copyright sale to DC Comics' predecessor. In 1992, there was also no termination right, because at that time, termination could only be, it was only a right of an author or an author's spouse surviving children or grandchildren. And Joe Shuster was never married and had no children. So no one held the termination right in 1992. It was not until 1998 with the passage of the Sonny Bonin Copyright Term Extension Act that the states, the executor of an estate, was given the termination right for the first time. The Shuster estate was never probated when Joe Shuster died. It was probated in 2003 for the express purpose of exercising this new termination right. And termination notices were served in 2003 on DC and filed with the Copyright Office. So what do we make of the informal probate that occurred prior to 1992? My understanding is there are provisions in California law when you have a, what they call I think a pauper's estate, to be able to release certain assets from the estate by filing a form with the probate court and then they release the assets and there were some shares of stock that were thereby released. But that wasn't followed with respect to any intellectual property rights because Joe Shuster had none. So after the Shuster estate filed termination notices, DC waited seven years until they claimed for the first time in 2010 that this 1992 pension agreement somehow impliedly eliminated the termination right by impliedly revoking Joe Shuster's very specific copyright assignments and impliedly and simultaneously regranting his rights in a post-'78 document that could not be terminated because Section 203 only applies to grants by authors. The problem with this claim is that the agreement says nothing of the sort. Three cases, two in this circuit, the Milne and the Newborn case, and one case in Steinbeck that followed Milne, have dealt with this issue. Milne and Steinbeck dealt with a statutory heir who has termination rights and specifically uses those termination rights to renegotiate terms of an old agreement and to expressly revoke a pre-'78 agreement and replace it with a post-'78 agreement. The court in both the Ninth Circuit and Second Circuit reasoned that although this might have the effect of eliminating the termination right, it was not in agreement to the contra under Section 304C5 because it in fact achieved the very purpose of the termination provisions. This court revisited that issue in the Newborn case and came to an opposite conclusion. In Newborn, the author's daughter, who was a statutory heir, entered into a 1978 assignment that regranted copyrights that had been granted in 1976. And the publisher argued, as D.C. does here, that by dealing with the same subject matter, it effectively revoked the 76 copyright grant and replaced it with a 78 grant. This circuit said no. They compared the case to Newborn. They were given the Congress's concerted objective to protect the termination right. The Ninth Circuit held that the redundancy in the 78 agreement, the same subject matter argument, just rendered that assignment a nullity because the publisher already owned those copyrights. They also reasoned that although Newborn's daughter had a termination right, there was no evidence in the record that she had used that as bargaining leverage to negotiate the new deal. And therefore, it fails under the Milne test, and the agreement as construed by the publisher would be an agreement to the contrary, and her termination right was preserved. Here you have a case that's even weaker than the publisher's case in the Newborn case. D.C. doesn't even get to first base under the Milne standard because there is no evidence of a revocation and regrant in this simple pension agreement with a release clause. The pension agreement doesn't even deal with the same subject matter as the agreement in the Newborn case. The pension agreement essentially doesn't try and convey Joe Shuster's copyrights. They're already owned by D.C. and sold in 1938. It assigns and releases any rights or claims which Joe Shuster's brother and sister might have, and they had none. D.C. presents no evidence whatsoever. First of all, the agreement contains no language of rescission, revocation. And this is the whole point, Your Honor. It contains no language of rescission, revocation, cancellation, replacement, or any of its synonyms. And given the tremendous value of the Superman franchises, that was the intent of D.C.'s lawyers who drafted this simple 1992 pension agreement. They would have said so in plain English. There's no mention of this whatsoever. So the agreement itself is evidence that that was not their intention. In addition, there was no plausible reason why D.C. in 1992 would have sought to revoke a clear chain of title from the author himself that was upheld in a 1947 case to have given D.C. all rights to Superman. And again, by the Second Circuit in 1974 to give D.C. all rights to Superman, there's no plausible reason why, because there was no termination right, to suddenly pick up and revoke those venerable grants and exchange them for the vague and ephemeral language in this 1992 agreement, which they now claim eliminates the termination right by revoking Joe Shuster's grants and replacing them with a new chain of title. Further evidence, they submitted declaration by Paul Levitz, who signed this 1992 agreement, and their motion is all about revocation and regrant. Nowhere in his declaration does he say that that was D.C.'s intent, where that would be the first thing he would say if that was the truth. He stays completely away from that. What he says is whenever an author and heir ask them for some financial assistance, they'd have them sign a release to make sure they wouldn't come back for more money. The important thing to understand is that the termination right, by statute, cannot be waived or pre-assigned or settled. And you can't promise never to bring a termination notice. But under your theory, the termination right was extinguished on the death of Shuster, right? The termination right, it expired on his death. So under your theory, then, it was revived with the passage of the 1998 Act. I wouldn't say it was revived. I would say that Congress decided that it's unfair just because someone wasn't married and didn't have children. Right. But, I mean, do you have any case that says that it applies to rights that have already been extinguished, that Congress' intent was to revive those rights? Well, yes. The extinguished argument is really a wordplay argument that D.C. has made. The statute says that when the rights have expired prior to the passage of the 1998 Copyright Term Extension Act, then they go to the author. And what we pointed out is that the termination provision is to provide an opportunity for an author to get the benefit of the copyright for the extended renewal term. And other provisions dealing with renewal use the same language of once the renewal expires or once the rights expire, then the renewal term will go to the author's executor. There are various provisions that deal with that in the copyright act. The term expired is used the same whether somebody died during the termination term or lived through the termination term. The whole point of Section 304D is to give the right for the extended renewal term when Congress is giving a second extension. Right. So under your theory, let's assume that Congress had not passed the 1998 Act and instead passed it in some future date, say 100 years from now. At that point, you think you could commence a new probate and revive the right? Yes, I would. It wasn't a new probate. It was the first time. Well, they had the other. There was a prior proceeding which in many states would constitute at least an informal probate. In this instance, the California Supreme Court approved the probate. Yes. I mean, I don't think there's any question about that. But, I mean, you think you could commence a probate. Let me take the word new out. A probate 100 years from now. I believe if they're giving rights to an estate just because an estate wasn't probated, you can go back and say now there is an asset here, Your Honor, which is a dime. Previously, it wasn't probated because there wasn't enough assets in the estate. Now there is an asset. We'd like to probate the estate for the express purpose of exercising this new right given under the Copyright Act. And that's what was done. And it was approved by California Superior Court. And after that, a notice of termination was served. All is intended by the Copyright Act. But the point is there is this right. And the argument that a 1992 agreement, which is utterly silent about revocation, where there's no reason to revoke a pre-'78 copyright grant or replace it with this chain of title, where D.C. itself continued to rely on the pre-'78 grants long after the 1992 grant. In the Siegel case, their counterclaims state unequivocally that the 1938 grants by Siegel and Schuster are still intact. And they continue to rely. They say even if the Siegel termination is valid, they still own Joe Schuster's half of the copyright by virtue of the original copyright grants from Siegel and Schuster. So the argument and the main issue here on appeal is this Court of the Order's finding that the settlement agreement despite the language in the statute that you have a termination right notwithstanding any agreement to the contrary, the Court's holding that said settlement agreement impliedly eliminated the termination right when it does nothing of the kind. Thank you, Your Honor. I'd like to reserve, if I may, unless you have further questions. It's 16 seconds to reserve. But we'll give you your five minutes of rebuttal. Let me just ask you a question or two, which doesn't come out of your time at all. The termination notice, which was, I guess, signed by the estate. I recall it stated that the termination rights were owned by the estate. It did not say anything about any partnership with Pacific, whatever it was, corporation. That wasn't an accurate statement of the ownership of the estate rights, was it? It was accurate. That's one of the defenses. They actually haven't pursued that. The court below held correctly, and we quickly admitted that. And that was the reason those original agreements were canceled shortly in 2005. So the issue is basically moot. But essentially, the rights cannot be transferred under 304C6D prior to service of a termination notice. So the estate owned all of the ---- You mean the agreement was invalid and contrary to law? It didn't serve to transfer any rights. So it was an irrelevancy. But was it an invalid agreement? Yes. And so the reason you didn't notify in the termination notice that you had, your client had assigned them to your corporation, the reason you didn't say that was because it was an agreement that was contrary to law? No. The reason that you don't say that, because the termination notices are very straightforward. What goes into a termination notice is governed by the regulations promulgated by the Copyright Office. Yes. Under 337CFR, I don't know the exact section. And they only say that you specify the author, the works, the grant, certain specific things. There's no rule. Who the owners were of the property rights. No. No, only the author and that you have a majority of the holders of the termination right. And in this case, there's only one holder, the executive of the estate of Joe Schuster. And that you specify that this person pursuant to this section holds the termination right, which is correct. But the termination right was held by the PPP, whatever it is, corporation. That's impossible. It wasn't held by that. And the original agreement. But there was an agreement that it would be held by that. No. Actually, the agreement was originally that the reversionary copyright interest would be held after service of a termination notice. There was nothing that you would transfer a right to terminate. That part was known at that time. The other was unknown. And when it was belatedly figured out, those agreements were canceled. But the point is a termination notice is simply to give notice to the other side. It doesn't require. Well, it's given notice to who they have to deal with, who the people are, who they during this period you have to deal with the owners. Yes, Your Honor.  Yes, Your Honor. But it does give fair notice of that. It's the Schuster estate. And I'm signing the termination notices for the Schuster estate. And as far as the claim about some sort of fraud on the Copyright Office, you file these notices require very little information. They don't require disclosure of any collateral agreements. And when you file them in the Copyright Office, there's a cover sheet from the lists the work, lists the authors. There's very perfunctory information. There's no other requirement in the Copyright Office or the regulations. And it – Look, the requirement in the law is that the people who receive the termination notice have an exclusive period within which to deal with somebody who's delivered the notice. But those people have already made an agreement with somebody else that they will not make any deals without the approval of the – of PPF or whatever it is. And PPF receives half of the proceeds or all of the proceeds. The notice is – you can give notice as early as 10 years in advance and as little as two years in advance. Yes. Go ahead. The termination would take effect in 2013, of October 2013. Notice was given 10 years in advance in 2003. By 2004, the PPC agreements were voluntarily canceled. In other litigation, in the Siegel litigation, those agreements that you're referring to were voluntarily produced to D.C. So there – and it was very – there was very little hampering except for the course of between mid-2003 and a few months in 2004. There was very little hampering of any ability to deal with anything. It was clear that I was representing them. It was clear that they were – the executor of the Schuster estate was exercising their rights under the Copyright Act. And there was – and the parties were dealing with each other consistently. So the statute, the regulations, which required very little, were followed. These agreements, which were invalid, were very quickly canceled when that was discovered. And it really didn't hamper any real notice. They had more than sufficient notice because notice was given 10 years in advance when it could have just been given two years in advance. And they had years and years and years and years in which to negotiate for the repurchase or relicensing of these recovered copyrights. All of this – the exercise of these termination rights were all pursuant to the Copyright Act and this revocation and regrant theory that the court relied on to eviscerate this important right. There is, I think, a lot of judicial resistance to the termination right. It goes against everything we're taught in law school that a deal's a deal and you accept consideration whether it's $10 or $10 million. You're stuck with that. Congress – the whole termination right was to cut through that. And there's a lot of policy discussion in the opposition papers about freedom of contract principles. But the whole purpose of the termination right is to cut through – the termination right itself abrogates freedom of contract principles. And then the provision that the right can be exercised notwithstanding any agreement to the contrary also cuts through these principles. I think I lost track of the question. What was it? I'm sorry. Well, I guess the question was to the validity of the termination notice. Yeah, that's what I thought. Yeah. All right. Well, we've gone considerably over your time, although not to be credited.  Thank you very much, Your Honor. Okay. Please, the Court. Daniel Petruccelli for Alkali D.C. Comics. Judge Weinhardt, if I could follow up on that last question to Mr. Toborow. Judge Wright dealt with this issue at page 14 of the district court opinion. And he pointed out that the PPC agreement, which was a joint venture that Mr. Toborow through his company Pacific Pictures entered into with the Schusters, purported to transfer any copyrights, any ability to recapture copyrights through the termination regime to this joint venture. And that's the executor, Mr. Peery, the son of Gene Peavy, testified under oath, as indicated at page 14 of the judge's opinion, that he believed that all of these termination rights had been transferred to this joint venture. That's 2001. Two years later, in 2003, Mr. Toborow files its notice of termination, but does not disclose that the rights have been transferred to his joint venture with the Schusters. When we filed suit seeking to invalidate the notice of termination, one of the stated grounds concerned this very deception on the copyright office. And it's part of our unclean hands ground for invalidating the notice. It turns out the district court, while he discussed this issue on page 14, didn't have to reach that ground because he found that the termination notice was effective for ineffective, excuse me, for an independent ground. That is, it was barred by the 1993 agreement. Right. That was going to be my question. I don't think the district court actually ended up reaching that issue. It did not reach that issue. Okay. What consequence is that to us? Only none, really, because we think that the decision should be affirmed on the basis that the court did reach. But were this court, for example, to disagree, then the case would have to be remanded and there would be other grounds that we would have, including that ground, for invalidating the notice. No, we can't rely on an alternate ground that could be found justified under the record because the district court didn't rule on it. Well, I think the court can affirm on grounds not decided below if it's in the record. And here we have on page 14 all the essential facts that show that this notice was ineffective because it was a deception on the copyright office. But if the court wanted to rely on that ground, I think the record is undisputed and it's found in the court's opinion. So it wouldn't have to remand if your ---- Not for that issue. A court could affirm, not only based on the 92 agreement, but in my view could affirm based on that ground that's set forth in page 14 and elsewhere in the court's opinion. If I can first address, Your Honor, the threshold contract interpretation issue and then I can turn to the agreement to the contrary issue. Asked by both sides in this case through cross motions for summary judgment to interpret the party's operative 1992 agreement, the district court ruled that in exchange for lifetime financial payments that continue to this day, Joe Schuster's lawyers fully settled and released all of Joe's prior copyright agreements and grants and replaced them with a new comprehensive grant to D.C. effective August 1992. Now fully aware that that August 1992 grant is a post 78 grant that cannot be terminated and fully aware that in order to have a right of termination, there has to be a pre-existing, pre-1978 grant in existence at the time of the notice of termination, the appellants argued in the district court, as they do here, that the parties did not intend by their 92 agreement to substitute a new grant for the pre-1978 grant and that the 92 agreement keeps all prior grants in effect. The district court correctly rejected that interpretation for three independent reasons. Reason one, the district court concluded that is simply unsupported by the language of the contract itself. Reason two, the district court concluded it's unsupported by the New York law governing novation of agreements and extinguishing the extinguishment of prior agreements. And number three, the district court concluded that Mr. Toborow's alternative interpretation was unsupported by any extrinsic evidence. In fact, the court said Mr. Toborow offered no extrinsic evidence in support of his interpretation, a finding that can't be disturbed absent an abuse of discretion. And when you go to this agreement, and listen, this agreement is written by Mr. Toborow in the broadest possible terms, as the judge found. It's, and the sole subject matter of this agreement are the copyrights and other rights of Joe Shuster in the works that he created. That's the sole subject matter. And the background of this agreement is that Joe died in July 1992 at the age of 67. And by the way, he had a termination right and could have exercised that termination right as early as 1984. He could have served the termination notice as early as 1984. He lived another eight years, and he never served it. He was satisfied with the arrangements that he had worked out. He dies in 92. His sole heir under his will was his sister, Jean. And he had a brother, Frank. And they approached D.C., and they wanted money to which they were not contractually entitled. They wanted lifetime payments. Frank had had an agreement that gave him lifetime payments of five grand a year, but they wanted more than that, and they wanted it for Jean's life. And Jean was younger. She was 72 at the time, and she's now 93, I believe. Anyway, they made an assertion to D.C. that if D.C. would give them money, lifetime money, they would not seek, they would not, quote, pursue the termination of the Superman copyright as provided for to creators, heirs in the 1976 U.S. Copyright Act. And that's at the ER 1242. That's the letter that precipitated this agreement. What's the date of that letter? The date of that letter is September 10, 1992, and it's in the record at ER 1242. And what's important about that letter is the subject matter of that letter is if you give us money, we will forbear from asserting a termination plan. And that led right to this agreement, which is dated as of August 1, 1992. But this agreement was signed, as it indicates, on October 2, 1992, about three weeks after that letter, in a meeting in New York. Is this the Waive Any Rights and Remedies letter you're talking about? Well, it goes far beyond that. But you're asking about the letter that I just referred to is the September 10, 1992 letter. I got you. The agreement is ER 704. That's the operative August 1, 1992 agreement. And this agreement – I was looking at 703. Okay. This agreement has a comprehensive – oh, on 703, Your Honor, if I can on that. Yeah, that's very important because 703 is an agreement entered into with Frank Schuster at the same time as the operative agreement, August 1, 1992. This agreement is a release of any personal pension claims that Frank might have, and it was put forth in a separate agreement because it dealt with his personal rights. That's 703. This agreement, the operative agreement, 704, ER 704, deals with one subject, and that is the heirs' rights as legal successors to Joe Schuster. And they had made a claim that they're going to be able to recapture copyrights in Superman. D.C. disagreed that they had such rights. And like any other matter, they resolved it and settled it by this document, which has been in existence since the last 20 years. No one's ever challenged its validity. It's never been the subject of any claim that it's not enforceable. There's been full performance under it. There's never been any claim that's a subject of mistake or duress or deception or anything. It's a completely valid and existing contract. And the key part of this contract is that it does two things. Number one, it fully settles all claims that the heirs might have with respect to any Joe Schuster copyrights. It not only fully settles, it fully releases in the broadest possible terms. There's no limitation. Any agreement regarding any copyright in any work created by your brother Joe Schuster, that's the first major thing it does. And then the second thing it does is that it then regrants those rights in the same document. And that regrant is effective as of August 1, 1992. And applying principles of New York law, which both sides agree govern this agreement and govern its contractual interpretation, the court properly concluded it could not be clearer that the parties intended to wipe out any prior agreements and grants that Joe Schuster had with respect to Superman copyrights and replace them with a new agreement going forward as of this day. And he applied Hornbook law involving novation of contracts, which is when you sign a second agreement, it extinguishes the first agreement and the party's obligations are measured beginning with the new agreement going forward. And, for example, the Goldbart case that the Court relied on has the operative language, whether the subsequent agreement, in whatever form it may be, as a matter of intention, expressed or implied, is a superseder of or substitution of the old agreement. That was the operative inquiry, whether this document eliminated the prior agreements and replaced the new one in its place. And the Court concluded it definitively did. By looking at the language, it had all the indicia that the New York case law discusses to determine whether prior agreements have been extinguished by a new agreement. Number one, it had the word – it dealt with the same subject matter as the prior agreement. You were – you've got three minutes left. Do you want to get on to the notwithstanding any – Okay. I'll get to that. Assuming then, Your Honor, that we have a valid revocation and a regrant, in other words, assuming that this document, as the Court found, operates to eliminate all grants prior to its date, all we're left with is now a 1992 grant from the U.S. to D.C. That grant cannot be terminated because Section 304 only applies to grants executed before 1978. So Mr. Tobraw comes back and says, well, even if it's a new grant, it should not be enforced because it's an agreement to the contrary under this other provision of the termination statute. That precise issue was first addressed by this Court in the Milne case back in 2005. And in the Milne case, the Court reviewed at length the legislative history of the termination statute and identified that nothing in the statute was ever intended to interfere with, to abridge, or to violate the freedom of contract that grantors and grantees or their legal successors had. And, in fact, as quoted in the Milne case in detail, the Court says that the grantor and grantee and their legal successors are permitted to terminate their grants, to Mr. Tobraw has conflated two sources of rights in his argument. He's focused on the right of termination that an heir gets in certain specified circumstances if there is a pre-'78 grant. But if the grantor and grantee or their legal successors have decided to make a new grant that has a date that's after January 1, 1978, you cannot terminate it. That's a congressional line that was drawn after a 15-year, very careful balancing of competing interests between authors and creators on one hand and publishers and rights holders on the other hand. And the Steinbeck case, Your Honor, also says exactly the same thing. And I want to talk about Steinbeck because it's really on all fours. In Steinbeck, Elaine Steinbeck, the third wife of John Steinbeck in 1994, entered into a similar agreement, wiping out an old grant, replacing a new grant. She dies. The 98 Act comes along, and John's children from another marriage want to terminate. And the Court says, You can't terminate. Your stepmom, before she died, entered into an agreement back in 1994 that wiped out the old agreement and replaced it with a new agreement. And they said, Well, we shouldn't be bound by that. That's an agreement to the contrary. And the Court said, No, no, no. Grantors, grantees, legal successors, they can always make new grants. And if it happens to extinguish a right of termination, that does not matter. It does not matter if the grant has the effect of extinguishing a termination, provided it's a grant after January 1, 1978. And what's very important about the Steinbeck case is in the 1994 agreement that extinguished the old grant and replaced it with a new grant, the parties actually recited that they wanted to preserve any termination rights. And the Second Circuit said, That doesn't matter either. Because whether or not you have a termination right doesn't depend on anybody's intention, whether you're intending to preserve something or intending to extinguish something. It depends on the date of the grant and the legal relationship between the people who are doing this. So if you have a grant after 78 between the legal successors of Joe Schuster and D.C., Milne and Steinbeck said, No more. You don't have a right to terminate. And what we're seeing here is simply an effort to effectively reverse those decisions. And what Mr. Toborow is principally relying on is the Mewborn case, because the Mewborn case goes his way. And so that's where he's putting his eggs in that one basket. But the Mewborn case, as judged right below found, dealt with a completely different issue. In Mewborn, there was a 1976 grant. That's pre-'78. Then, right after the new statute went into effect in January 1, 1978, two months, three months later in March, Mrs. Mewborn enters into a second grant. However, unlike our agreement, or unlike the Milne agreement, and unlike the Steinbeck agreement, that grant expressly retained the pre-'76 grant. It expressly carried it forward. It did not revoke or extinguish or novate or supersede or replace it. It expressly affirmed it. And so the Court said, effectively, this is an easy case. We have a pre-1978 grant. You have a second agreement post-'78. But that agreement leaves intact the pre-'76 grant. So, of course, the pre-'76 grant can be terminated. And so Mewborn not only doesn't help the appellants, it underscores why Milne and does the contract extinguish the prior grant and leave only a new post-'78 grant in its place? And if it does, there is no right to terminate. So unless the Court has any additional questions, that's the summary on the agreements of the contrary issue. Thank you. Thank you. Your Honors, I'd like to address the unclean hands issue, which you're interested in. First of all, I note that D.C. stated in their opposition brief to this Court that issues, too many issues of fact bar decision on that. I believe that can be disposed in our favor. Unclean hands is the closest analogy in the copyright world is when, in a copyright infringement action, when somebody sues to enforce a copyright and they claim you can't enforce that copyright because your registration of that copyright with a copyright office was fraudulent. That's the closest analogy we have in the cases. And Nimmer and other cases have said that that argument, there's a heavy burden in making that argument. You need, first of all, an application which is factually inaccurate. You need a misrepresentation of the copyright office. Here there's no misrepresentation because if, as D.C. has always argued, the PPC agreements were invalid and didn't transfer any rights or any copyrights or had no effect whatsoever, then there's no misrepresentation failing to list a transfer that has no relevance. Secondly, not only does there have to be a material misstatement of the copyright office, but the copyright office needs to have relied on those misrepresentations for it to affect the validity of a copyright. And here there's no reliance on the misrepresentations and there's no misrepresentation because there's no transfer of copyrights. Also, neither innocent misstatements nor deliberate but non-material misstatements will overcome the presumption of validity in filings with a copyright office. So I don't believe, given the facts here and also given the fact that neither the termination notice or the simple form you file with a copyright office, just to file the notice, would require to have list these agreements that were quickly canceled within six months after that because they were ineffective. I think it's a red herring. Addressing the other argument about the termination rights, they make an argument that because Joe Shuster died within the termination window, that his rights were executed only if they're expired. And this argument contradicts the copyright office itself, which states without any preconditions or qualifications that under Section 304D, the termination right expires 59 years after the copyright was secured. And in stating that in the statute, they state that whether or not the author lived through the copyright term. And those regulations are 67 Fed Reg 69134 to 69135. Courts also routinely use the phrase expired to mean rights that are lost at death. And, in fact, the Steinbeck case, dealing with this precise issue, stated that Elaine Steinbeck's statutory termination rights, quote, unquote, expired upon her death. So I think there's no basis for that extinguish, expire argument. Going back to the – and I think that because these have been fully briefed, they can be decided in our favor by this Court. However, they can't – I don't think they can be decided against us. The unclean hands issue, decide that against us, it would raise material issues of fact that would have to be tried. But I believe there's no basis as a matter of law for that unclean hands claim. The – as far as the 1992 agreement is concerned, the important thing to remember here is that they have the burden to provide evidence that it was the intent of the parties to revoke all of Joe Shuster's prior copyright grants and to replace them. And they have not met that burden. They provided no evidence whatsoever. The 1992 agreement itself is evidence that that was not their intent. They rely on New York law, which is fine, but New York law is no different than the law in California. As one might imagine, to rescind an actual agreement, you need evidence of a clear and definite intent that that was the intention of both parties. And they provided no such evidence. Every case dealing with novation in New York states this stringent standard and will hold, when you don't meet this standard, that there is no novation. They state also, quote, unquote, novation will never be presumed, which is exactly what was done here, without any basis in the contract whatsoever. And again, it's counterintuitive that D.C. would want to suddenly revoke Joe Shuster's grants, which were upheld in two court judgments, to give it all rights to Superman and replace it for some release language from a non-author. I believe the Court, in reaching its decision, original decision in its tentative, I believe the Court was under the misapprehension that you can settle out the termination right. That when you say, I won't bring any more claims, I am settling the right, that that's binding. And that precisely is not. You cannot settle the termination right. They point to legislative history at the House report in 94, 1976. The Congress says the right cannot be waived in advance or contracted away. The legislative history they point to at 203 is misleading because they leave off the tail in the quote. And that's a quote from Section 203. As I mentioned, 203 is different than 304. 203, termination is 35 years after a grant. So when an author revokes a post-'78 grant and replaces it with a new one, which to do that, it doesn't eliminate the termination right triggering Section 304C5. It just starts the clock again. And the part of the quote that they left out, it says, Section 203 would not prevent the parties to a transfer from voluntarily agreeing at any time to terminate an existing grant and negotiating a new one. They leave out of the quote, thereby causing another 35-year period to start running, meaning the termination is not eliminated. It simply is delayed for some time. There's just no basis for a court to find, and certainly not on summary judgment, where they provide no evidence and they have the burden that the parties intended for no reason at all, when there was no termination right, to revoke Joe Shuster's grants and start a new chain of title. Well, let me just go back to a basic question about how this works. Say that DC Comics wanted to acquire the complete rights and know that it has them forever. There's no way they can pay the heirs a million dollars, a hundred million dollars, a billion dollars in exchange for surrendering the termination right? That's correct, Your Honor. There's only two ways to eliminate the termination right. And sometimes studios do this. They will approach an heir and they'll say, you have a termination right. We want you to exercise the termination right. And here's the notice. We filled it out for you. Exercise the termination right and the same day or the next day, sign this assignment back to us and we'll give you a million dollars. And that would be, that could be upheld because they're exercising the right, they're getting the rights back, and then they're granting it because you can only transfer the reversionary interest after exercise of the right pursuant to statute. I mean, the statute governs. And Milne and Newborn in this circuit was very careful. They didn't even focus on revocation and regrant alone. They spent paragraph after paragraph talking about the fact that this was not an agreement to the contrary, even though it had the effect of eliminating the termination right, because the DC. But Milne didn't use the procedure you described. They didn't use that procedure. I mean, isn't the notion leverage as opposed to, I mean, if you have to exercise the termination notice rights to settle the case, then Milne doesn't make any sense. You're right, Your Honor. Actually, I jumped to Milne too soon. I was going to say there are two ways. One way is the way I mentioned. The other way was, is based on a carefully circumscribed exception that was crafted in Milne and upheld in the Newborn case. And that exception says that ordinarily an agreement which has the result of eliminating the termination right would be an agreement to the contrary. But here, because you actually have a termination right, which Gene and Frank did not have, and you use that termination right as leverage, and you said, look, I'm going to terminate, and then I could sell the rights back to you if the price is right, or I'll sell the rights to another studio depending on the negotiation. Or we can do that contractually, and you use the right as leverage and expressly revoke a pre-'78 grant and replace it with a post-'78 grant, although that has the effect of eliminating the termination right. The Ninth Circuit held that's not contrary to the termination right because it achieves the very objective of the right. And the objective of the right is Congress was cognizant that authors, when they first like Siegel and Schuster, they create Superman. No one understands the value. They get paid $130. It's now a multibillion-dollar industry. And so publishers, Congress recognized that they wanted to give authors and their estates the opportunity to realize the value of their works long after those works were created. And it's not just revocation and re-grant, which is what they argue here because they can't say the termination right was used as leverage. It's being able to use the termination right to level the playing field and have a transaction that is cognizant of market value. This isn't like the Siegel case where we're purely dealing with a settlement contract after they exercise the right, and they still get millions of dollars under that contract. Here, the district court completely wiped out the Schuster estate's right. Under his ruling, they get zero. And that contradicts the statute. It contradicts Congress's intent. And it contradicts this Court's binding precedent. The reference in some letters to termination, it's not important what they thought. It's important what D.C. knew. It may be. If the question is where do they have knowledge of potential leverage. It's not leverage with a publisher. It's created by the publisher's knowledge. And the publisher knew they had no rights. In fact, I can read to you, there's a letter that is in the record. They told them they didn't think they had any rights. I'm familiar with the record. If I may, Your Honor, Paul Levitt's September letter refers to the meeting in 1992 before signing the agreement. It's in the record at page 706. And he says, it is our firm conviction based on the research, based on that research and expert counsel that you don't have any legal rights or claims whatsoever. Hence, they had no leverage. They had no termination rights. D.C. knew so. And that's why the simple 1992 agreement reads like a quick claim. It doesn't purport to transfer Joe Schuster's copyrights. It purports to transfer whatever rights or claims they may have. So this doesn't satisfy Milne. They don't even get to first base with a revocation or regrant. And because there's no termination right, termination was not used as leverage to enter into a new arrangement. And a $25,000 pension, after which they deduct taxes split two ways, certainly does not achieve what Congress intended, which is to allow authors and their estates to be able to benefit from the increased market value of the works. In this case, Superman. You make it seem as if D.C. Comics is a charitable institution and they knew that the heirs had no rights, would never have any rights, but they just decided to pay $25,000 a year because they were such good guys. Yes, Your Honor, and that's what Paul Levitt says in his letter at 706 of the Record. He said, we have no legal obligations to you whatsoever. We're doing this in memory of your brother. I think it's commendable. It was a charitable act. Okay. So what consideration flowed from it? What consideration, if your theory is correct, what consideration did Gene make? What was the consideration for the deal in terms of Gene's? I mean, the brother I understand, he had some rights under the prior agreement, but she didn't have any rights. So the consideration was not to what? For her to acknowledge she's not going to come back to them and claim money and ask them for money. And she hasn't. She hasn't breached that agreement. We're not saying that's an invalid agreement. The agreement says what it says and it's valid. And, you know, there are certain forms of legislation that protect authors or heirs against themselves. When you have an imbalance, a collective bargaining agreement, a union agreement like the Writers Guild Agreement, the Writers Guild Agreement has a situation where it says, if the terms of my employment contract as a writer are less favorable to me than those terms in this collective bargaining agreement, the collective bargaining agreement supersedes. What's the reason for that? The reason is when you have an imbalance of power, that Congress understood that unless they made this termination right inalienable, that publishers would go and offer not a statutory successor, not the person who's intended to have the termination right, but could offer a devisee or some successor or a foundation some money to actually get rid of the termination right. And the intended beneficiaries of that right wouldn't have that right. And so they instituted provisions which prevent that from happening. And this court, this circuit was very respectful of the Copyright Act in the Milne and Mewbourne decision. They didn't limit this to a contract analysis. And, you see, if you just talk about contracts, you're replacing one federal copyright regime and a very carefully circumscribed exception in the Milne and Mewbourne case with a contract free-for-all. The contract law is 50 different states. So that means that every time somebody exercises their termination right to something of value, that now under this holding of the district court, the publisher will be able to find some agreement with some release language and it's going to be... I think we better end your part. You've had the equivalent of two arguments. So thank you. Thank you, Your Honor. And we'll give Mr. Petruccelli, I think, five minutes to answer the second argument. Okay. And I appreciate the additional time you gave me. Thank you. Thank you very much. Mr. Tobaroff's position is simply inconsistent with the holdings in Milne and Steinbeck. Mr. Tobaroff's position is that parties are unable to enter into a new grant and that the only way a termination right can be extinguished is by going through the termination regime. But that was the very issue that was presented in Milne and Steinbeck. And both courts agreed, no, no, no, Congress has a whole other separate congressional set of people to protect, and that's grantors and grantees and their legal successors, and they can do whatever they want. If Joe Shuster had not died, if Joe Shuster had signed that agreement in 1992, it could not be terminated. The fact that his heir signed it doesn't make a difference. The distinction here that Congress drew out in detail in Milne, as well as Steinbeck and in Newborn, is that we're giving the right to terminate to heirs in certain circumstances because we're extending the term of the Copyright Act. We're going to add more years than had previously existed. In some instances, we want families of authors and creators to get the benefit of those years. However, in doing so, after debating this for almost 12 to 14 years, we're not going to at all interfere with the ability of the parties to change their grants, to modify them, to enter into new ones, to terminate them. That's explicit. And, in fact, if you read Milne and Steinbeck, they say Congress expressly endorsed the right and power of grantors and grantees to change their grants. And they went on to say in those cases, if doing so, if making a new deal happens to have the effect of extinguishing a termination right, that's okay. And in terms of the leverage issue, Your Honor, I don't believe there's any holding in those cases that you have to actually leverage your termination right, but to the extent we want to indulge that, that's precisely what happened here. Because what happened here is that Frank and Gene came forward and said, Joe just died. We believe we may have rights under the Termination Act. You disagree. We have a dispute. And we want to resolve it. And we want lifetime payments to which we're not entitled under any other contract or any other source of law. And that resulted in the settlement. And the settlement could not be broader in its scope that, okay, we'll give you the money, but you're forever releasing and discharging and settling all prior agreements of Joe Shuster relating to his copyrights and Superman and any other works that he created. And it could not be broader. And number two, you're re-granting all those rights to us, which you as legal successors, you're the only people who have the right to stand in his shoes. You are the legal successor. She had written to D.C. saying, I'm the heir under his will. She was both the sole beneficiary under his will, and she was the executrix under his will. So she stood in his shoes. And the brother was the only other heir under the laws of intestacy. So D.C. was dealing with the two heirs who had the legal status of legal successors to Joe Shuster. And that's a Joe Shuster copyright agreement. Get rid of the old grant. Replace it with the new grant. Here's the money going forward. And every case you read, and there's only three of them, Steinbeck, Milne, and Newborn, all say grantors and grantees and their legal successors have the power to make these new grants even if they have the effect of extinguishing the right of termination. Even if the person is leveraging a right she does not have, Elaine Steinbeck did not have a right of termination when she made her 94 deal with Penguin. The reason she did not is because the law requires you to have more than 50% of the termination interest. And John left his wife and two kids. The wife had 50. The two kids had 25 each. You had to join them all to get over the 50% threshold. They were at war with each other. So she had no ability to terminate. They had no ability to terminate. Nonetheless, she asserted her termination right. And the court said you make an agreement. You got rid of the old grant. You put in a new grant. The new grant's after 1978. You leveraged your termination right even though you didn't have one. You still used it as leverage. You got money for it. It's a valid contract. And that's it. And just the opposite of what Mr. Toberoff said, just the opposite, there was never any intention for Congress in passing the termination statute to make every single grant, which have always been governed by state law, all copyright grants are covered by state law, the making of the contract by which you assign the copyright, whether it's a valid contract or not. They had no intention to change that. And all of a sudden, federalized making of contracts to transfer copyrights, which is what Mr. Toberoff is now saying. He is now saying even though you don't need it. I agree. You're over your five minutes, so you can have a final sentence. You don't need it. It should be affirmed. Thank you. Okay. Thank you all very much. Very interesting argument. And case disargued will be submitted. Court will stand in recess for the day.
judges: Sedwick, Reinhardt, Thomas